UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

───────────────
№ 02-CV-5219 (JFB) (AKT)
───────────────

THE PROVIDENT BANK,

                                        Plaintiff,

FIRST SAVINGS BANK, FSB,

                                        Intervenor Plaintiff,

WAREHOUSEONE ACCEPTANCE COMPANY IV, LLC,

                                        Intervenor Plaintiff, and

NETBANK,

                                        Intervenor Plaintiff,

VERSUS

COMMUNITY HOME MORTGAGE CORP.,
COMMUNITY HOME FUNDING GROUP, LTD., AND
IRA SILVERMAN,

                                        Defendants.

───────────────
MEMORANDUM AND ORDER
May 7, 2007
───────────────

JOSEPH F. BIANCO, District Judge:

Plaintiff Provident Bank ("Provident") brings the instant action alleging breach of contract, fraudulent representation and breach of guaranty, and requesting an accounting and appointment of a receiver, against defendants Community Home Mortgage Corp. and Community Home Funding Group, Ltd. (collectively, "Community") and Ira

Silverman ("Silverman") (collectively, "defendants"). Intervenor-plaintiffs Southwest Securities Bank, formerly known as First Savings Bank, FSB ("Southwest"), Warehouseone Acceptance Company IV, LLC ("Warehouseone") and NetBank ("NetBank") intervened in the action to assert claims against Community and each other.

NetBank asserts a cross-claim against Southwest for a declaratory judgment in Netbank's favor; in addition, Southwest asserts counter-claims against NetBank for constructive trust, unjust enrichment, conversion, and for a declaratory judgment in Southwest's favor.

Southwest now moves, under Federal Rule of Civil Procedure 56, for summary judgment as to NetBank's cross-claim and its own counter-claim for a declaratory judgment, or, in the alternative, for relief pursuant to the Court's equity powers. NetBank cross-moves for summary judgment, seeking a declaratory judgment in its favor as to its cross-claim and Southwest's counter-claim. For the reasons that follow, Southwest's motion for summary judgment is denied. NetBank's motion for summary judgment is granted.

I. BACKGROUND

A. The Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local 56.1 statements of facts.[1]

Defendant Community was a mortgage banker authorized to conduct mortgage banking operations in New York, as well as other states. (Southwest's 56.1, ¶ 5.) Community originated residential mortgage loans. (*Id.*) Southwest and RBMG, Inc. ("RBMG") did business with Community – Southwest, as a "warehouse lender,"[2] and RBMG as a "correspondent lender." (Southwest's 56.1, ¶¶ 2-3.) Intervenor-plaintiff NetBank is a successor in interest to RBMG, Inc. (Stagg Aff., ¶ 1.)

In order to obtain the money to fund the mortgages it originated, Community entered into agreements with banks such as Southwest and RBMG to fund a portion of the purchase price associated with the loans. (Southwest's 56.1, ¶ 6; Ex. A.) In a Mortgage Purchase Agreement ("MPA") between Community and Southwest, the parties provided that Community would sell a loan it had originated to Southwest, and that the purchase price paid by Southwest would be used by Community to fund the closing of the loan.[3] (Southwest's

---

[1] Where one party's 56.1 statement is cited, the fact is not contested by the other party, unless otherwise indicated.

[2] "Warehouse lending" is a practice by which

> Mortgage bankers use their revolving lines of credit with commercial banks to close and record mortgage loans in their own names, pledging the secured mortgage notes as collateral with the banks. Thereafter, the banks hold onto or "warehouse" the mortgage loans until they are reassigned and sold to a permanent lender.

Madison, Dwyer, and Bender, 2 *Law of Real Estate Financing* § 11:7 (Database updated November 2006).

[3] NetBank contends that Southwest did not actually purchase mortgage loans from Community. According to NetBank, the MPA created a loan or line of credit in favor of Community, pursuant to which Community could

2

56.1, ¶ 7, Ex. A.) Community would then be obligated to sell the loan within 60 days in order to repay Southwest, plus interest and fees. (Southwest's 56.1, ¶ 8, Ex. A.) Similarly, under RBMG's Correspondent Mortgage Purchase Agreement ("CMPA") with Community, RBMG agreed to purchase mortgage loans from Community. (NetBank's 56.1, ¶ 2; Southwest's 56.1, Ex. W.)

Community allegedly engaged in a scheme known as "double-booking."[4] (Southwest's 56.1, ¶ 13.) Pursuant to this scheme, each mortgage borrower executed duplicate original promissory notes and mortgage assignments.[5] (Southwest's 56.1, ¶ 14.) Community thereby obtained duplicate funding for one loan from two different warehouse lenders, and retained the entire value of the loan for its own purposes. (NetBank's Intervenor Compl., ¶ 48.) After the loan was sold to a permanent investor, only one of the warehouse lenders would be paid in full. (NetBank's Intervenor Compl., ¶ 49.) As a result, the investor and the unpaid warehouse lender would have conflicting recorded mortgages and assignments. (NetBank's Intervenor Compl., ¶ 49.) In the case of nine loans, one original note and assignment was sold to Southwest, and duplicate original documents were sold to RBMG.[6] (Southwest's 56.1, ¶ 14.) As a result of Community's fraud, there are a total of nine loans which were sold to both Southwest and RBMG and for which each now claims a priority interest:

(1) The Brockman loan, in the amount of $246,050;
(2) The Duhigg loan, in the amount of $238,000;
(3) The Kassorla loan, in the amount of $300,000;
(4) The Martinez loan, in the amount of $236,000;
(5) The Matterson loan, in the amount of $284,500;
(6) The McDuffie loan, in the amount of $177,050;

---

maintain an outstanding balance of up to ten million dollars in loans that Southwest had funded, but which were not yet repaid to Southwest. (NetBank's Response to Southwest's 56.1, ¶ 7.) In distinguishing Southwest and NetBank's relationships with Community, NetBank asserts: "Southwest extended a line of credit to Community in exchange for a secured interest in the notes associated with the mortgage loans Community originated. NetBank purchased loans from Community without extending any line of credit to Community." (NetBank's Response to Southwest's 56.1, ¶ 12.) As discussed *infra*, this issue need not be resolved for purposes of these motions.

[4] Both intervenor-plaintiffs agree that Community engaged in fraud by "double-booking" loans. (Southwest's 56.1, ¶ 13; NetBank's Am. Intervenor Compl., ¶¶ 47-53 (Stagg Aff., Ex. 16).) Therefore, for purposes of deciding this motion, the Court shall assume that Community, in fact, did engage in a fraudulent double-booking scheme.

[5] NetBank disputes that Community, or any other entity, defrauded the mortgagors. (NetBank's Response to Southwest's 56.1, ¶ 14.) However, this dispute is immaterial to the issues pertinent to the pending motion.

[6] NetBank disputes that Southwest received the original note for the Nienstedt loan, which is one of the disputed loans. (NetBank's Response to Southwest's 56.1, ¶ 14; Stagg Aff., Ex. 1.) This dispute is immaterial because Southwest does not assert a priority interest in this loan.

(7) The Nienstedt loan, in the amount of $195,000;
(8) The Ladioray loan, in the amount of $238,000; and
(9) The Musgrove loan, in the amount of $251,000.

(Wicker Aff., Exs. B-J.)

When Southwest purchased mortgages from Community it, *inter alia*, took possession of the original notes and received and recorded assignments of the mortgages. (Southwest's 56.1, ¶ 9, Ex. A.) Southwest took possession of its notes after RBMG in the case of all but the Kassorla loan, which it received on the same day. (NetBank's 56.1, ¶ 9.) Community did not endorse any of the notes provided to Southwest. (NetBank's 56.1, ¶ 6.) Southwest recorded its assignments of the mortgages before RBMG in the case of five loans: the Duhigg, Kassorla, Martinez, Ladioray, and Musgrove loans. (Southwest's 56.1, Exs. B-S.)

RBMG received the original note and assignment for each of the nine disputed loans. (NetBank's 56.1, ¶ 4.) Seven of the notes (for the Brockman, Duhigg, Kassorla, Martinez, Matterson, McDuffie and Nienstedt loans) were endorsed by Community through defendant Daniel Silverman, its Executive Vice-President. (NetBank's 56.1, ¶ 5, Exs. B-H.) Daniel Silverman made the endorsements by stamping the last page of each note as "[p]ayable to the order of RBMG, Inc. without recourse," and by signing each stamped note. (NetBank's 56.1, ¶ 5, Exs. B-H.)

B. Procedural History

On September 27, 2002, Provident Bank filed the instant action. On October 11, 2002, the Honorable Denis R. Hurley granted Southwest's motion to intervene in the instant action. On July 28, 2005, Judge Hurley granted NetBank's motion to intervene in this action.

This case was reassigned to the undersigned on October 2, 2006. On November 1, 2006, Southwest moved for summary judgment and NetBank cross-moved for summary judgment. Oral argument was held on April 13, 2007.[7]

II. DISCUSSION

A. Standard of Review

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not

---

[7] After the motion was fully briefed, Southwest submitted a sur-reply and, following oral argument, Southwest submitted a letter addressing legal issues discussed at oral argument. Southwest did not receive permission for these additional filings, and NetBank objects to the Court's consideration of them. However, NetBank's objection is moot, because the Court has fully considered Southwest's supplemental papers and, for the reasons set forth below, finds their arguments unpersuasive.

4

to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

B. Evaluating Mortgage Assignments Under Real Property Law and UCC Article 9

Generally, a secured real property transaction consists of two documents: the mortgage document and the note or bond. *In re Stockbridge Funding Corp.*, 145 B.R. 797, 807 (S.D.N.Y. 1992), *aff'd in part & vacated in part on other grounds*, 158 B.R. 914 (S.D.N.Y. 1993). The mortgage document creates a security interest in the real property, while the note or bond represents the debt that is secured by a mortgage. *Id.* While it is apparent that "these transactions [mortgage assignments] create security interests in *the notes*, and the proceeds therefrom – security interests that are governed by Article 9 of the Uniform Commercial Code," courts have also had to address whether Article 9 or state real property law governs the security interests in *the mortgages*. *Ryan v. Zinker* (*In re Sprint Mortgage Bankers Corp.*), 177 B.R. 4, 7 (E.D.N.Y. 1995) (citing New York Uniform Commercial Code (hereinafter "NYUCC") § 9-102(2), § 9-102 cmt. 4) (additional citations omitted). In the past, in the absence of certainty as to which statutes govern mortgages, creditors, such as plaintiff-intervenors, have been on uncertain footing as to how to perfect their security interests in such mortgages. Under Article 9, there is no doubt that a security interest in a note is perfected by taking possession of the note. NYUCC § 9-304(1). Historically, under race-notice statutes codified in state real property law, a security interest in a mortgage was perfected by recording the assignment. N.Y. Real Prop. L. § 291. However, under the principle that "the mortgage follows the note," the issue is whether Article 9 now governs perfection of both the note and the mortgage. NYUCC § 9-308(e) ("Perfection of a security interest in a right to payment or performance also perfects a security interest in a security

interest, mortgage, or other lien on personal or real property securing the right.").

When faced with assignees asserting competing interests, courts have struggled over whether to apply the tenets of race-notice statutes under real property law – by which the first party to record his assignment gains priority – or to evaluate the priority of interests under the UCC, by which a security interest is perfected by taking possession of the note or bond. *See, e.g.,* Kasnowiecki, Miller & Ziff, *The Kennedy Mortgage Co. Bankruptcy Case: New Light Shed on the Position of Mortgage Warehousing Banks*, 56 Am. Bankr. L.J. 325, 328-29 (Fall 1982) (addressing the existing confusion as to "what steps are sufficient to perfect a security interest against the notes and mortgages"). Alternatively, some courts have applied a bifurcated approach, by which the court evaluates the security interest in the note under Article 9, while it turns to real property law to determine whether the assignment of the mortgage must be recorded; however, courts that have applied a bifurcated analysis generally have avoided conflict between the two interests by concluding that a party's entire interest was either perfected or unperfected. *See, e.g.*, 1C-16 *Secured Transactions Under the Uniform Commercial Code* § 16.09[2][d] (2007) ("The bifurcated analysis has not caused the invalidation of assignments that were not recorded in the real estate records. It has only caused confusion.").

This case presents an unusual situation, since it is undisputed for purposes of this motion that Community created two original notes and mortgages for each of the disputed loans. While both original notes and mortgages cannot secure the same interest – that is, each mortgagor is not required to pay two banks twice over for the same home – both Southwest and NetBank concede that the Court has no way of determining which notes and mortgages were valid and which ones were not at the inception of the loans. Furthermore, the case law and statutes regarding priority of interest in notes and mortgages do not specifically address adjudication over duplicate original notes and mortgages.

In the absence of a clear framework for analysis of the intervenor-plaintiffs' claims, each of the intervenor-plaintiffs urges this Court to apply a different approach. Each party's approach advances its own priority interest in the disputed loans based upon the steps (or lack thereof) taken to perfect its interest in the mortgage assignments from Community. In the case of Southwest, which took possession of eight of the notes *after* RBMG/NetBank, but, in the case of five loans, recorded its assignments of the mortgages *first*, urges the court to apply New York's race-notice statute. RBMG/NetBank, which took possession of the *notes* for eight of the disputed loans *before* Southwest, but recorded its assignments of the *mortgages after* Southwest in four out of the nine loans, asserts that real property law does not apply in this instance, and that Article 9 should govern the Court's analysis.

Southwest also argues that, should the Court find that real property law is not applicable, rather than turning to Article 9, this Court should divide the interests in the loans equally between the two intervenor-plaintiffs in an exercise of the Court's equitable powers.

Although the Court assumes, for purposes of this motion, that Community perpetrated its fraud by issuing two original notes and

6

mortgages for the same loan, Southwest and NetBank now find themselves standing on different ground based upon the acts taken to perfect their interests since receipt of the notes. As set forth below, because the status of the original notes held by each of the parties is not equal, the Court is guided by Article 3 and Article 9 of the UCC in reaching its conclusions. The Court declines to exercise its equity powers to divide the interests equally between the two parties, as requested by Southwest, because NetBank has perfected its security interests in the loans and Southwest has not.

### C. Southwest's Motion for Summary Judgment

Southwest moves for summary judgment as to its claims against NetBank for conversion, unjust enrichment, and a declaratory judgment regarding the Duhigg, Kassorla, Ladioray, Martinez, and Musgrove loans ("the Five Loans"), urging this Court to find that, where, as here, Community provided two original notes and mortgage assignments for each loan, "race-notice" statutes should guide the Court in choosing the rightful owner of the loan. According to Southwest, because it recorded its interest in the Five Loans before NetBank, the Court should grant summary judgment in its favor and issue a declaratory judgment stating that Southwest holds a priority interest in the Five Loans and is entitled to all principal and interest collected on the loans since their inception, as well as any principal or interest to be collected in the future.[8]

---

[8] According to Southwest, "[i]f the Court determines that Southwest is entitled to summary judgment on these loans, NetBank would likewise be entitled to summary judgment in its favor on the Brockman Loan, Matterson Loan and McDuffie Loan." (Southwest's 56.1, ¶ 17 n.17.)

[9] In the case of the Musgrove loan, which secures a property located in Pennsylvania, that state's recording statute, which mirrors New York's, states:

### 1. New York Real Property Law § 291

New York Real Property Law Section 291 governs the recording of conveyances of real property, including the assignment of mortgages, in this state.[9]

> All deeds, conveyances, contracts, and other instruments of writing wherein it shall be the intention of the parties executing the same to grant, bargain, sell, and convey any lands, tenements, or hereditaments situate in this Commonwealth, upon being acknowledged by the parties executing the same or proved in the manner provided by the laws of this Commonwealth, shall be recorded in the office for the recording of deeds in the county where such lands, tenements, and hereditaments are situate. Every such deed, conveyance, contract, or other instrument of writing which shall not be acknowledged or proved and recorded, as aforesaid, shall be adjudged fraudulent and void as to any subsequent bona fide purchaser or mortgagee or holder of any judgment, duly entered in the prothonotary's office of the county in which the lands, tenements, or hereditaments are situate, without actual or constructive notice unless such deed, conveyance, contract, or instrument of writing shall be recorded, as aforesaid, before the recording of the deed or conveyance or the entry of judgment under which such subsequent purchaser, mortgagee, or judgment creditor shall claim. Nothing contained in this act shall be construed to repeal or modify any law

7

Pursuant to Section 291:

> A conveyance of real property, within the state, on being duly acknowledged by the person executing the same, or proved as required by this chapter, and such acknowledgment or proof duly certified when required by this chapter, may be recorded in the office of the clerk of the county where such real property is situated, and such county clerk shall, upon the request of any party, on tender of the lawful fees therefor, record the same in his said office. Every such conveyance not so recorded is void as against any person who subsequently purchases or acquires by exchange or contracts to purchase or acquire by exchange, the same real property or any portion thereof . . . in good faith and for a valuable consideration, from the same vendor or assignor, his distributees or devisees, and whose conveyance, contract or assignment is first duly recorded, and is void as against the lien upon the same real property or any portion thereof arising from payments made upon the execution of or pursuant to the terms of a contract with the same vendor, his distributees or devisees, if such contract is made in good faith and is first duly recorded.

N.Y. Real Prop. L. § 291. Under this statute, "[a] mortgage is held to be a conveyance and an assignee thereof a purchaser." *Gray v. Delpho*, 162 N.Y.S. 194, 198 (N.Y. Sup. Ct. 1916) (citing N.Y. Real Prop. L. § 290, 291) (additional citations omitted); *Chen v. Geranium Dev. Corp.*, 663 N.Y.S.2d 288, 289 (N.Y. App. Div. 1997) ("The New York Recording Act . . . *inter alia*, protects a good faith purchaser for value from an unrecorded interest in a property, provided such a purchaser's interest is first to be duly recorded.") (citing N.Y. Real Prop. Law §§ 290 *et seq*.). Thus, under the statute, "a *bona fide* purchaser for value, without notice of a junior mortgage, who records his assignment is entitled to priority over a prior unrecorded mortgage of which his assignor had full knowledge." *Id.* (citations omitted).

Thus, under New York's race-notice statute, whichever intervenor-plaintiff first recorded its assignment of Community's mortgage has a priority interest in such loan. In *Finn v. Wells*, this principle was applied where a mortgagee assigned the same bond and mortgage to two different parties. 237 N.Y.S. 580, 581 (N.Y. Sup. Ct. 1929). The court held that because Finn, the plaintiff, had recorded his assignment first, the assignment to defendant Wells was void under Section 291, notwithstanding the fact that the bond and mortgage remained in the possession of the mortgagee until they were transferred to Wells. *Id.* at 582; *see also Gibson v. Thomas*, 180 N.Y. 483, 488 (N.Y. 1905) (holding possession and occupancy by another insufficient to defeat the priority interest established under the recording act: "the earlier recorded assignment of a mortgage should give it relative priority over every other form of conveyance of an interest in the land affected"); *Doyle v. Lazarro*, 306 N.Y.S.2d 268, 270 (N.Y. App. Div. 1970)

---

providing for the lien of purchase money mortgages.

21 Penn. Stat. § 351; *see also Muller v. McNamee*, 20 Phila. 644, 647 (Ct. Cm. Pleas 1990) ("The effect of this statute is to protect subsequent purchasers by giving a subsequent bona fide purchaser for value without notice of a prior transaction priority over the equitable estate of the first owner.") (citations omitted).

8

(granting title to subsequent purchaser who recorded his deed, over the holder of an unrecorded tax lien); *Household Fin. Realty Corp. v. Emanuel*, 769 N.Y.S.2d 511 (N.Y. App. Div. 2003) ("While executed prior to plaintiff's mortgage, the [first] mortgage lost its priority because plaintiff, a good-faith lender for value, recorded its security interest first without knowledge of the prior loan.") (citing N.Y. Real Prop. L. § 291); *Builders Equity, Inc. v. Larkport Bldg. Corp.*, 185 N.Y.S.2d 595, 596-97 (N.Y. Sup. Ct. 1959) (where mortgagor executed two mortgages on the same land, the purchaser of the mortgage that was first recorded was held to have a "prior and superior lien").

Recently, the New York Supreme Court applied Section 291 to a situation involving mortgage assignments. In *Washington Mutual Bank v. Peak Health Club, Inc.*, 2005 N.Y. Misc. LEXIS 3392, 233 N.Y.L.J. 123 (N.Y. Sup. Ct. 2005), Merrill Lynch made a loan of approximately $5 million to defendant Peak. The loan was secured by a mortgage of real property, and was evidenced by a note in the same amount. *Id.* at *1. In July 1998, defendant Peak had executed and delivered a deed on the same property to defendant East Coast, who in turn executed and delivered a mortgage on the property to plaintiff Washington Mutual Bank ("WAMU"). *Id.* at *2. Neither the deed to East Coast nor the mortgage to WAMU was recorded until *after* the mortgage to Merrill Lynch was recorded. *Id.* Construing Section 291, the court held that "the burden is on the subsequent grantee [Merrill Lynch] to prove its status as a purchaser in good faith and for valuable consideration." *Id.* at *4 (citing *Hood v. Webster*, 2 N.E.2d 43 (N.Y. 1936)). The court concluded that, Merrill Lynch having met this burden, WAMU's mortgage lost its priority. *Id.* at *6 ("Although executed prior in time, the mortgage to WAMU lost its priority because Merrill Lynch, a good faith lender for value recorded its mortgage first and lacked notice and knowledge of [f]acts which placed it under a duty to make further inquiry of the [f]acts and circumstances of the transaction.") (citing *Household Fin. Realty Corp.*, 769 N.Y.S.2d at 513) (additional citation omitted). Significantly, the court found that where "the prior conduct was fraudulent," "it must be shown that the subsequent grantee who recorded first knew or should have known of the fraud." *Id.* at *5. No such allegations have been made in this case, and therefore, under Section 291, each intervenor-plaintiff would be entitled to those mortgage assignments that it recorded first. *Id.* at *6 ("While there may have been elements of fraud in connection with the transactions, Merrill Lynch was justified in relying on the protection of the Recording Act and as between Merrill Lynch and the other parties to these actions Merrill Lynch was in no better position than any other party to prevent the perpetration of such a fraud.") (citing *LPP Mortgage, Ltd. v. The Card Corp.*, 793 N.Y.S.2d 346 (N.Y. App. Div. 2005)).

Thus, the case law construing Section 291 supports the position that the first party to record an assignment has priority against all subsequent bona fide purchasers. *See, e.g., In re Stockbridge Corp.*, 145 B.R. at 809 (holding that "[p]re-Uniform Commercial Code cases support" the position that recording assignments perfects an interest in the mortgages) (citing *Chittick v. Thompson Hill Dev. Corp.*, 245 N.Y.S. 71 (N.Y. App. Div.), *aff'd*, 181 N.E. 458 (N.Y. 1930), *Goettlicher v. Willie*, 134 N.Y.S. 977 (N.Y. Sup. Ct. 1912), *aff'd*, 141 N.Y.S. 1121 (N.Y. App. Div. 1913), and *Westbrook v. Gleason*, 79 N.Y. 23 (N.Y. 1879)). However, with the exception of *Finn v. Wells*, which was decided

9

*before* enactment of the UCC, none of the above-cited cases stand for the proposition that the first party to record a mortgage assignment has a priority interest over another party who first takes possession of the note securing the mortgage. In fact, these cases construing only the race-notice statute make no reference whatsoever to perfection of the security interest in the note; therefore, they have little bearing in a case where, as here, the parties contest the supremacy of perfecting the security interest *in the note* versus perfecting the security interest *in the mortgage* in determining priority. It is that situation to which the Court shall now turn.

2. UCC Article 9

Several courts in this Circuit have rejected the application of Section 291 in instances where parties assert competing interests in mortgage assignments. These courts have held that, because mortgage assignments constitute notes that are secured by mortgages, such interests are governed not by real property law, but by Article 9 of the Uniform Commercial Code. Any "security interest in a secured obligation" is subject to the provisions of UCC Article 9.[10] NYUCC § 9-109(b). While section 9-109(c)(11) excludes from the scope of the statute "the creation or transfer of an interest in or lien on real property," courts have found that, because section 9-109(b) states that "Article 9's applicability 'to a security interest in a secured obligation is *not affected* by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply," the statute nevertheless governs perfection of security interests in mortgage assignments.[11] For example, in

---

[10] The parties contest whether Southwest purchased the loans outright from Community or was merely a secured creditor (NetBank's Br., at 4-5; Southwest's Reply Br., at 2-3.) While this issue presents a question of fact, the resolution of the question is not material to the Court's analysis, as Article 9 applies in any case. *See* N.Y. UCC 9-109(a)(3) (holding that a sale of a promissory note is subject to Article 9).

[11] In the face of the apparent conflict between these provisions of Article 9 regarding its applicability to real property liens, the 1966 comment to UCC section 9-102(3) [revised 9-109(b)] sought to resolve some of the confusion by providing an illustration:

> The owner of Blackacre borrows $10,000 from his neighbor, and secures his note by a mortgage on Blackacre. This Article is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee, even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, this Article applies to the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage. This Article leaves to other law the question of the effect on rights under the mortgage of delivery or non-delivery of the mortgage or of recording or nonrecording of an assignment of the mortgagee's interest. See Section 9-104(j). But under Section 3-304(5) recording of the assignment does not of itself prevent X from holding the note in due course.

NYUCC § 9-102(3), cmt. 4. This comment "has been widely read as mandating a bifurcated analysis of the perfection of the interest when the mortgagee makes a collateral assignment of the note and mortgage," whereby Article 9 governs perfection of the interest in the note, but courts must look to real property law to determine whether the mortgage assignment must be

10

*Ryan v. Zinker* (*In re Sprint Mortgage Bankers Corp. I and II*), where plaintiff assignee had recorded his mortgage assignments, but failed to take possession of the notes, the court rejected appellants' reliance on section 9-104(j) [revised 9-109(c)(11)] to argue that Article 9 did not apply; rather, the court concluded that the plaintiffs' interests had not been perfected and were thus subordinate to those of the bankruptcy trustee. 177 B.R. at 7. Similarly, in *In re Stockbridge Corp.*, the court held that "§ 291 does not apply when the mortgagee assigns his rights to realty paper." 145 B.R. at 809. The same conclusion was reached in *In re Churchill Mortgage Investment Corp.*, which refused to consider the argument that Article 9 was inapplicable to adjudicating the rights of parties to real property, holding that such a conclusion had been "considered and expressly rejected by the courts." 233 B.R. 61, 69-70 (S.D.N.Y. 1999) (citing *Sprint Mortgage II*, 177 B.R. at 7, *Sprint Mortgage I*, 164 B.R. at 229, *In re Stockbridge Funding*, 145 B.R. at 807-08, *Bank of Tokyo Trust v. Urban Food Malls, Ltd.*, 650 N.Y.S.2d 654, 661-62 (N.Y. App. Div. 1996), and *In re Sackman Mortgage Corp.*, 158 B.R. 926, 938 (S.D.N.Y. 1993) (holding notice provisions of N.Y. Real Prop. Law inapplicable to Article 9 foreclosure sale)).

recorded. 1C-16 *Secured Transactions Under the UCC* § 16.09[2][b]; *see also In re Stockbridge Funding Corp.*, 145 B.R. at 807 n.22 ("Although [revised 9-109(c)(11)] appears to contradict Official Comment 4 of 9-102(3) [revised 9-109(b)] . . . courts and commentators have concluded that [9-109(c)(11)] severs treatment of an obligation to pay (governed by Article 9) from treatment of the property which secures that obligation (governed by state property law).") (citations omitted).

This Court agrees with the cases in this Circuit which have held that, pursuant to Article 9, possession of the note perfects the assignee's security interest, under the principle that the mortgage follows the note:

> [W]e conclude that the perfection of a security interest in a note is governed exclusively by Article 9, regardless of whether any mortgage securing the note has been properly recorded. It is an established tenet in real property law that whoever has priority to the obligation has priority to the underlying mortgage. One follows the other. Thus, in the absence of a statute expressly requiring delivery of the mortgage to the assignee or the recordation of a mortgage assignment, we conclude that perfection and priority of a security interest in the note (by taking possession under Article 9) should carry over to the mortgage incidental to it.[12]

---

[12] Some courts have extended Article 9 even further and have held that Article 9 also governs the assignment of the mortgage itself:

> New York courts have held that the plain meaning [of] section 9-102(3) [revised 9-109(b)] and Official Comment 4 . . . indicate that Article 9 applies "to all facets of transactions using mortgages and notes as collateral except those issues that arise when the mortgagee's creditor is attempting to enforce the mortgagee's rights under the mortgage."

*In re Sprint Mort. Corp. II*, 177 B.R. at 7 (quoting *Fed. Deposit Ins. Corp. v. Forte*, 463 N.Y.S.2d 844, 849 (N.Y. App. Div. 1983)) ("We recognize that the cases are divided as to whether the Uniform Commercial Code applies to a pledge of realty paper as collateral. . . . Since the motion . .

*In re Stockbridge Funding Corp.*, 145 B.R. at 810; *see also In re Apponline.com, Inc.*, 285 B.R. 805, 820 (E.D.N.Y. 2002) ("It is undisputed that [creditors] had possession of the notes in question and therefore had perfected security interests in the mortgages in question."); *In re Churchill Mort. Inv. Corp.*, 233 B.R. at 70 (holding that, where a party never took possession of the loan note and mortgage, its security interest was never perfected).

"In New York, the collateral assignment of a secured note, including a mortgage note, creates a security interest in the note." *In re Stockbridge Funding Corp.*, 145 B.R. at 808 (citing *Forte*, 463 N.Y.S.2d at 849). "In order to perfect a security interest in a note under Article 9 of the NYUCC, the secured party must take possession of the note." *In re Sprint Mort. Bankers Corp. II*, 177 B.R. at 7 (citing NYUCC § 9-304(1) ("[A] security interest in . . . instruments . . . can be perfected only by the secured party's taking possession.")); *see also* NYUCC § 9-305 ("A security interest in . . . instruments . . . may be perfected by the secured party's taking possession of the collateral. . . . A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained."). Under the principle that the mortgage follows the note, "possession of the note perfects the right to payment, regardless of what actions are taken by the payee with respect to recording the mortgage. . . . Therefore, the assignee is not required to file the assignment in real estate records nor take any action with respect to the mortgage to perfect." *In re Stockbridge Funding Corp.*, 145 B.R. at 808-09 (citing *In re Kennedy Mortgage Co.*, 17 B.R. 957, 965 (D.N.J. 1982) ("The failure to record the assignment of the mortgage would not be fatal to the right of FNBB to realize upon the mortgage as against parties . . . because FNBB has a perfected lien on the note and the mortgage is only collateral to the note. The mortgage without the debt is of no effect.")).

In this instance, where Southwest was not the first party to perfect its security interest in the disputed loans under Article 9 by taking possession of the notes, the fact that

---

. is distinct from the mortgagee's rights under the mortgage and is nothing more than a motion for the remainder due on the promissory note, article 9 applies.") (internal citations omitted); *Landmark Land Co. v. Sprague*, 529 F. Supp. 971, 977 (S.D.N.Y. 1981) (holding that "article 9 governs the collateral assignment of a real property interest securing a note as well as the collateral assignment of the note itself"), *rev'd on other grounds*, 701 F.2d 1065 (2d Cir. 1983); *but see In re Stockbridge Funding Corp.*, 145 B.R. at 810 ("The conclusions in *Forte* and *Landmark Land*, however, confuse real property law with the U.C.C. . . . Real property law does not require a recording of an assignment of the mortgage to perfect a security interest in the mortgage, so long as the secured party takes a written assignment of the mortgage and takes and maintains possession of the note. Simply put, we believe that real property law should govern the mortgage, while possession of the note determines who has a security interest."); *In re Maryville Sav. & Loan Corp.*, 743 F.2d 413, 415 (6th Cir. 1984) (rejecting the bankruptcy court and district court's assumption "that article nine perfection requirements applied either to the entirety of this transaction or not at all – that is, it applied either to both the notes and the deeds or to neither"). However, in the instant case, it is of no import whether the mortgage itself is governed by Article 9 or real property law, since under the principle that "the mortgage follows the note," the end result is the same where, as here, a party has perfected its security interest by taking possession of the note.

Southwest recorded its mortgage assignments before NetBank is insufficient for it to maintain a priority interest in such loans. Therefore, Southwest's motion for summary judgment as to its request for a declaratory judgment granting it a priority interest in the five loans is denied. Likewise, Southwest's motion for summary judgment as to NetBank's request for a declaratory judgment granting it a priority interest in the disputed loans is denied.

### 3. Conversion

Under New York law, a "'denial or violation of the plaintiff's dominion, rights, or possession, is the basis of an action for conversion.'" *Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (quoting *Sporn v. MCA Records, Inc.*, 448 N.E.2d 1324, 1326 (N.Y. 1983)) (internal citation omitted). "A conversion implies a wrongful act, a misdelivery, a wrongful disposition, or withholding of the property." *Id.* (citation omitted). Here, Southwest cannot establish a valid claim for conversion under New York law because (1) Southwest's interests in the Five Loans are inferior to NetBank's, and (2) Southwest cannot show any violation of its possessory interest in the loans by NetBank. Therefore, the Court denies Southwest's motion for summary judgment as to its conversion claim.

### 4. Unjust Enrichment

In order to state a claim for unjust enrichment, Southwest must establish "(1) that a benefit was conferred on [NetBank], (2) that [NetBank] received the benefit without adequately compensating [Southwest], and (3) that circumstances are such that equity requires that [NetBank] make restitution. *Sobek v. Quattrochi*, No. 03-CV-10219 (RWS), 2004 U.S. Dist. LEXIS 24584, at *25 (S.D.N.Y. Dec. 9, 2004). A claim for unjust enrichment is based on "'an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another." *In re Chateaugay Corp.*, 10 F.3d at 957-58 (quoting *Miller v. Schloss*, 113 N.E. 337, 339 (N.Y. 1916)). Since Community allegedly engaged in fraud by double-booking loans to both Southwest and RBMG, and the intervenor-plaintiffs concede that there is no way of knowing which of the loans are valid, there is no basis for the Court to conclude that NetBank has received interests in the loans to which it is not entitled, and for which it owes Southwest compensation. Therefore, the Court denies Southwest's motion for summary judgment as to its unjust enrichment claim.

### D. NetBank's Motion for Summary Judgment

NetBank moves for summary judgment on the basis that, under Article 9, it was first to perfect its interests in eight of the disputed loans; moreover, NetBank argues that, as a holder in due course of the disputed loans under UCC Article 3, it possesses a superior interest in them.

Under the analysis set forth *supra*, the Court finds that, with regard to all but the Kassorla loan, NetBank perfected its security interests in the disputed loans prior to Southwest by taking possession of the notes. Therefore, under Article 9, the Court grants summary judgment in NetBank's favor as to the Brockman, Duhigg, Martinez, Matterson,

McDuffie, Nienstedt, Ladioray and Musgrove loans. *See* NYUCC § 9-305; 13 Pa.C.S. § 9313; *In re Sprint Mort. Bankers Corp. II*, 177 B.R. at 7; *In re Stockbridge Funding Corp.*, 145 B.R. at 808-09.

The Court also finds that NetBank has a priority interest superior to Southwest's as a holder in due course of the Brockman, Duhigg, Kassorla, Martinez, Matterson, McDuffie and Nienstedt loans, pursuant to UCC Article 3, which, independently of Article 9, also entitles NetBank to summary judgment as to these loans. Under UCC Article 3, "[a] holder in due course is defined as a (1) holder (2) of a negotiable instrument (3) who took it for value, (4) in good faith, and (5) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of another." *Wilson v. Toussie*, 260 F. Supp. 2d 530, 541-42 (E.D.N.Y. 2003) (citing NYUCC 3-302(1)). "'Satisfaction of these requirements is all that is necessary for a payee to obtain the special protections of a holder in due course.'" *Id.* at 542 (quoting *Hartford Acc. & Indem. v. Am. Express Co.*, 542 N.E.2d 1090, 1093 (N.Y. 1989)); *see also In re Apponline.com*, 285 B.R. at 818-19 (holding that lenders who purchased mortgages from mortgagees constitute holders in due course).

Generally, "[n]egotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order, it is negotiated by delivery with any necessary endorsement." NYUCC 3-202(1). Under the UCC, a holder is defined as "a person who is in possession of . . . an instrument . . . , issued or indorsed to him or to his order or to bearer or in blank." NYUCC 1-201(20). The required form of the indorsement is set forth as follows: "[a]n indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto so as to become a part thereof." NYUCC 3-202(2); *see also* NYUCC 3-202, cmts. 2-3. "Thus, although a party may be a transferee of an instrument, it does not follow that such party must also be a holder within the meaning of UCC Article 3." *Hauser v. W. Group Nurseries, Inc.*, 767 F. Supp. 475, 486 (S.D.N.Y. 1991) (citing *Consol. Capital Corp. v. DeSalvo*, 550 N.Y.S.2d 803 (N.Y. Civ. Ct. 1990)).

"If a party is not a holder, it cannot be a holder in due course since UCC 3-302(1) defines a 'holder in due course' as a 'holder who takes the instrument.'" *Hauser*, 767 F. Supp. at 486 (holding that, where the note was "neither drawn nor issued to [defendant] and is neither drawn nor issued in blank, [defendant] is not a holder") (citing *Nat'l Bank of N. Am. v. Flushing Nat'l Bank*, 421 N.Y.S.2d 65, 66 (N.Y. App. Div. 1979) (holding that plaintiff was not a holder in due course where plaintiff took possession of certificates, but such certificates were not indorsed by the transferor and were "merely pledged" by a separate document as security for the loan)). "Without an indorsement a transferee cannot be a holder." *Flushing Nat'l Bank*, 421 N.Y.S.2d at 66; *see also Marine Midland Bank, N.A. v. Price, Miller, Evans & Flowers*, 57 N.Y.2d 220, 225 (N.Y. 1982) (holding that accepting a check without indorsement "would generally preclude a person from being a holder, and thus a holder in due course").

Under the UCC, NetBank is a "holder" of the notes, since they are in possession of the notes, and such notes have been indorsed to them. *See* NYUCC 1-201(20); Wicker Aff., Exs. B-C, E (notes endorsed "Paid to the Order of RBMG, Inc. Without Recourse"),

Exs. D, F-H (notes endorsed "Pay to the Order of RBMG, Inc."). NetBank purchased the notes, which constitute negotiable instruments, for value, in good faith, and without notice that such notes had any claim against them. NYUCC 3-302(1); *Wilson*, 260 F. Supp. at 541-42. Both parties concede that the notes are negotiable instruments that were purchased for value. (NetBank's Br., at 12; Southwest's Reply Br., at 4-5.)

Under Article 3, "good faith" requires "honesty only," and "does not require the exercise of due care."[13] *In re Apponline.com*, 285 B.R. at 819 ("Even if [the warehouse lenders] harbored suspicions about certain of [mortgagee's] practices, and a prudent warehouse lender would have undertaken more due diligence regarding [mortgagees], their failure to do so does not defeat their claim of good faith.") (footnote omitted). Similarly, "[t]o constitute notice of a claim or defense, the purchaser must have notice of the claim or defense or knowledge of such facts that his action in taking an instrument amounts to bad faith." NYUCC § 3-304(7). "Under New York law, a subjective test is employed to determine whether a holder has notice of a claim or defense." *In re Apponline.com*, 285 B.R. at 819 (citing *Fortunoff v. Triad Land Assocs.*, 906 F. Supp. 107, 113 (E.D.N.Y. 1995) (citing *Indyk v. Habib Bank, Ltd.*, 694 F.2d 54, 56 (2d Cir. 1982))). At the time that NetBank purchased the disputed loans from Community, it had no knowledge or notice of any claims or defenses against the enforcement of the notes and mortgages. Furthermore, NetBank had no actual knowledge that Community had executed duplicate original notes for the same loans to Southwest. Thus, NetBank purchased the notes without notice of any claims. In conclusion, the Court finds that NetBank is a holder in due course of the notes.[14]

Southwest argues that, even if NetBank is a holder in due course, its notes may not be enforceable against a defense of "fraud in the factum." (Southwest's Br., at 5 n.12; Southwest's Reply Br., at 6; Southwest's Apr. 17, 2007 Ltr., at 2.) Under Article 3, a holder in due course takes an instrument "free from . . . all defenses of any party to the instrument with whom the holder has not dealt except . . . (c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." NYUCC § 3-305; *see also* NYUCC § 3-305 cmt. 7 ("The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge."). "Fraud in the factum occurs in those 'rare cases' where 'the misrepresentation is regarded as going to the *very character* of the proposed document itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 91 (2d Cir. 1994) (citing E.A. Farnsworth, *Contracts* § 4.10 (1990))

---

[13] There is no evidence whatsoever, nor is it alleged by Southwest, that NetBank harbored any suspicions about Community's practices when they took possession of the endorsed notes.

[14] The perfection of the parties' secured interests under Article 9 has no bearing on the determination of their priority interests under Article 3. *In re Apponline.com*, 285 B.R. at 820 ("It is undisputed that [the warehouse lenders] had possession of the notes in question and therefore had perfected security interests in the mortgages in question [under Article 9]. However, this question has no bearing on [the warehouse lenders'] status as holders in due course of the notes and mortgages in question.").

15

(dismissing claim against banks as holders in due course and finding no fraud in the factum where documents at closing differed slightly from those shown to plaintiffs earlier, on the basis that plaintiffs "nevertheless were signing just what they thought they were signing: a note and a deed."). Where, as here, there is no evidence that the mortgagors were unaware that they were signing mortgage notes, or were falsely informed as to the nature of the notes, fraud in the factum cannot be asserted as a defense to NetBank's holder in due course status. *See, e.g., In re Joe Sipala & Son Nursery Corp.*, 214 B.R. 281, 288 (holding that fraud in the factum defense "is only available when trickery in the actual issuance of the original check is demonstrated," such as where "the maker of the note could not read or understand the English language or did not have a reasonable opportunity to be informed of what he was signing") (citations omitted); *see also* N.Y. UCC § 3-305, cmt. 7.

Southwest also contends that, even if NetBank is, in fact, a holder in due course, such an argument is to no avail because *both* intervenor-plaintiffs are holders in due course. (Southwest's Br., at 5 n.12; Southwest's Reply Br., at 6.) According to Southwest, because both parties hold identical, equally valid notes, Article 3 does not offer any guidance in resolving the dispute as to which party has the priority interest. (Southwest's Br., at 5 n.12 ("The holder in due course analysis simply does not resolve the problem caused by their [sic] being a single debt evidenced by two notes, one of which is unenforceable.").) However, NetBank argues that, because the notes to Southwest were never indorsed, Southwest cannot claim holder in due course status. Southwest concedes that Community never indorsed the notes to Southwest. Yet, it maintains that "the mere fact that Southwest's notes were not indorsed does not prevent Southwest from being a holder in due course."[15] (SW's Reply Br., at 5.) The sources cited by Southwest do not support this proposition. In *Nat'l Bank of N. Am. v. Flushing Nat'l Bank*, relied upon by Southwest, the Appellate Division of the New York Supreme Court actually denied holder in due course status to plaintiff where it took possession of certificates that were not indorsed. 421 N.Y.S.2d at 66 ("Without an indorsement a transferee cannot be a holder . . . Thus, plaintiff took the certificates subject to all defenses."). Likewise, 80 *N.Y. Jurisprudence, Negotiable Instruments & Other Commercial Paper* § 297, also cited by Southwest, states that "one who takes an order instrument by assignment or transfer without indorsement by the payee or any special indorsee is not a holder, and thus *not a holder in due course*, and cannot become one until the indorsement is made." (Emphasis added).

Similarly, Southwest's argument that, because Community was required to indorse the notes to Southwest under Article 3-202(1), it is a holder in due course notwithstanding Community's failure to indorse, must also fail. (SW's Reply Br., at 5.) The mere *right* to have the indorsement of the transferor is clearly distinct from the actual indorsement of a note. It is the indorsement on the instrument itself, not the right to indorsement, that vests the transferee with the status of holder. NYUCC 3-202; *see also* 80 *N.Y.*

---

[15] Southwest also asserts that "Community had already given Southwest a power of attorney allowing Southwest to indorse the notes itself." (SW Reply Br., at 5; SW Ex. X.) This assertion is of no avail, as to date, the notes have not been endorsed to Southwest. The mere potential for indorsement is insufficient to satisfy the holder in due course requirements of Article 3.

*Jurisprudence, Negotiable Instruments & Other Commercial Paper* § 297. Thus, Southwest remains only a transferee, entitled to the same rights that Community had in the instruments, and subject to any defenses that could be asserted against Community. *Id.*

Therefore, the Court finds that, under Article 3, NetBank is a holder in due course of the notes securing the Brockman, Duhigg, Kassorla, Martinez, Matterson, McDuffie and Nienstedt loans, and Southwest, by contrast, is not. Accordingly, NetBank's motion for summary judgment is granted as to its request for a declaratory judgment in its favor.

In sum, the Court grants summary judgment in NetBank's favor under Article 9, or, alternatively, under Article 3 with respect to the Brockman, Duhigg, Martinez, Matterson, McDuffie and Nienstedt loans. The Court grants summary judgments in NetBank's favor solely under Article 9 with respect to the Ladioray and Musgrove loans. The Court grants summary judgment in NetBank's favor solely under Article 3 with respect to the Kassorla loan.

### III. CONCLUSION

For the reasons stated above, Southwest's motion for summary judgment is DENIED, and NetBank's cross-motion for summary judgment is GRANTED.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 7, 2007
Central Islip, New York

\* \* \*

The attorneys for intervenor-plaintiff Southwest are David Buono, Esq., and Richard A. Illmer, Esq., of Brown McCarroll LLP, 2001 Ross Avenue, Suite 2000, Dallas, Texas 75201. The attorneys for intervenor-plaintiff NetBank are Andrew Scott Kazin, Esq., and Thomas E. Stagg, Esq., of Simmons, Jannace & Stagg, LLP, 75 Jackson Avenue, Syosset, New York 11791.